IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| James Albert Littlehale, | ) | C/A No.: 1:15-1460-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action *pro se* pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On March 22, 2012, Plaintiff protectively filed applications for DIB and SSI in which he alleged his disability began on January 1, 2009. Tr. at 83, 85, 192–93. His

applications were denied initially and upon reconsideration. Tr. at 115–18, 119–22, 126–27, 128–29. On June 26, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Carl B. Watson. Tr. at 33–60. (Hr'g Tr.). The ALJ issued an unfavorable decision on August 22, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 14–32. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 1, 2015. [ECF No. 1].

  B.  Plaintiff's Background and Medical History

    1.  Background

Plaintiff was 56 years old at the time of the hearing. Tr. at 37. He completed high school and some college coursework. *Id.* His past relevant work ("PRW") was as a training instructor, a candy packer, and a tech support specialist. Tr. at 57. He alleges he has been unable to work since January 1, 2009. Tr. at 36.

    2.  Medical History

Plaintiff presented to Shashikant Mehta, M.D. ("Dr. Mehta"), to establish primary care treatment on May 14, 2008. Tr. at 685. He indicated his insurance had lapsed and that he had not been on medications for nearly a year. *Id.* Dr. Mehta referred Plaintiff for lab work and to the optometry clinic to rule out diabetic retinopathy. Tr. at 686. He prescribed Actos for diabetes, Cozaar for hypertension, and Zocor for hyperlipidemia and indicated he would prescribe Glyburide after reviewing Plaintiff's lab work. *Id.*

2

Plaintiff followed up with Dr. Mehta on August 26, 2008. Tr. at 677. Dr. Mehta indicated Plaintiff had gained 13 pounds in the prior three months. *Id.* Plaintiff's hemoglobin A1c level was elevated at 8.7 percent. *Id.* Dr. Mehta increased Glyburide from once to twice a day and Actos to 45 milligrams. *Id.* Plaintiff's blood pressure was elevated, and Dr. Mehta increased Losartan to 50 milligrams twice a day. *Id.* His thyroid-stimulating hormone ("TSH") was elevated, and Dr. Mehta increased his dose of Levothyroxine. Tr. at 678. Dr. Mehta also increased Plaintiff's Zocor dose to 40 milligrams because his cholesterol was above his goal. *Id.*

On March 31, 2009, Plaintiff reported to Dr. Mehta that he was experiencing daytime somnolence, snoring, and apneic episodes. Tr. at 659. Dr. Mehta noted that Plaintiff had gained 25 pounds. *Id.* He indicated Plaintiff's diabetes was poorly-controlled because of his noncompliance with diet, exercise, and weight loss. *Id.* He stated he would prescribe insulin at Plaintiff's next visit if he failed to lower his hemoglobin A1c level. *Id.*

Plaintiff followed up with Dr. Mehta on July 14, 2009. Tr. at 647. Dr. Mehta indicated Plaintiff's diabetes was poorly controlled and he prescribed 10 units of Lantus insulin at bedtime. Tr. at 648. He indicated Plaintiff had elevated TSH and increased his dosage of Levothyroxine. *Id.* He referred Plaintiff for a nuclear stress test because of multiple risk factors for cardiac disease. *Id.*

Plaintiff underwent magnetic resonance imaging ("MRI")[1] of his pituitary gland and brain on August 25, 2009. Tr. at 297. The MRI showed no pituitary tumor, but indicated a moderate degree of white matter changes. *Id.*

Plaintiff followed up with Dr. Mehta on October 28, 2009. Tr. at 631. Dr. Mehta indicated a nuclear stress test was negative for reversible ischemia and that the MRI ruled out pituitary abnormality. *Id.* He stated Plaintiff missed his appointment for a sleep study and had gained seven pounds since his last visit. *Id.* Dr. Mehta indicated Plaintiff's hemoglobin A1c had decreased from 9.6 percent to 7.5 percent, but remained above his goal. *Id.* He increased Plaintiff's dosages of Metformin and potassium. Tr. at 631–32.

Plaintiff underwent polysomnography on January 12, 2010. Tr. at 441–42. He experienced mixed apneic events with oxygen desaturation into the low 80s. Tr. at 441. Use of continuous positive airway pressure ("CPAP") was ineffective, and Plaintiff was changed to bilateral positive airway pressure ("BiPAP"). *Id.* He continued to have some difficulty with BiPAP, but his apneic events were relieved as long as he slept on his right side. Tr. at 441–42. Craig Klinges, RRT/RPSGT, indicated Plaintiff should use the BiPAP settings, sleep on his right side for 90 days, and follow up in the CPAP clinic. Tr. at 442.

Plaintiff presented to David Whitson, M.D. ("Dr. Whitson"), on March 1, 2010, after refusing to see Dr. Mehta. Tr. at 608. He complained of a rash and edema in his left

---

[1] Dr. Mehta indicated "PT NEEDS OPEN MRI AS PT IS VERY CLAUSTROPHOBIC EVEN WITH PREMEDICATION." Tr. at 354. A subsequent note indicates "vet too large and claustrophobic for MRI at WB needs open air MRI R hip and both knees." Tr. at 392.

foot. Tr. at 609. Dr. Whitson observed Plaintiff to have 3+ edema and psoriatic plaques. Tr. at 610. He was unable to palpate peripheral pulses in Plaintiff's leg, but indicated Plaintiff had no evidence of active cellulitis. *Id.* He prescribed Lisinopril for hypertension and kidney protection, Lasix for edema, and Lidex cream for psoriasis, and he discontinued Actos because of weight gain. *Id.* He also encouraged Plaintiff to lose weight by following a diabetic diet and to exercise three to four times per week for at least 30 minutes. *Id.*

Plaintiff followed up with Dr. Whitson on April 12, 2010. Tr. at 601. Dr. Whitson increased Plaintiff's dosage of Valsartan for kidney protection and hypertension. *Id.* He indicated Plaintiff's lab work was satisfactory and noted that Plaintiff had lost weight since his last visit, but was still morbidly obese at 342 pounds. Tr. at 601–02. He indicated Plaintiff was doing well and that his diabetes, hyperlipoproteinemia, hypertension, and psoriasis were under good control. Tr. at 602.

On August 9, 2010, Desiree R. Andrefsky, LPN ("Ms. Andrefsky"), performed a diabetic foot examination and noted that Plaintiff had decreased pulses in his bilateral feet. Tr. at 596. Plaintiff followed up with Dr. Whitson. Tr. at 590. Dr. Whitson noted that Plaintiff's hemoglobin A1c had increased, and Plaintiff indicated he had been under more stress recently and had not been exercising. *Id.* Plaintiff complained of dental pain from fractured and cracked teeth, and Dr. Whitson indicated he needed a dental consultation. *Id.* Dr. Whitson advised Plaintiff that he would require more insulin if he did not work to reduce his weight. Tr. at 590–91. He noted that Plaintiff was 75 inches tall, weighed 332 pounds, and had a body mass index ("BMI") of 41.58, which was

consistent with morbid obesity. Tr. at 591. He observed Plaintiff to have decreased sensation to monofilament nylon and slightly decreased reflexes physiologically. *Id.* Dr. Whitson noted Plaintiff "was a very knowledgeable medic who works on the fire truck and he knows how to take care of himself but does not do so." *Id.*

Plaintiff presented to Dr. Whitson on March 30, 2011, with complaints of acute bronchitis, obesity, erectile dysfunction, hypokalemia, diabetes, diabetic retinopathy, psoriasis, sleep apnea, and increased pain in his hips and knees. Tr. at 573–74. He indicated his hips slipped when he walked and requested he be referred for an x-ray. Tr. at 574. He stated non-steroidal anti-inflammatory drugs ("NSAIDS") were not helping his pain. *Id.* Dr. Whitson instructed Plaintiff to take 50 milligrams of Tramadol three times a day and indicated Plaintiff would be scheduled for an x-ray within the next several weeks. *Id.* He advised Plaintiff to reduce his weight and noted that he would have more problems if he did not get his weight down. Tr. at 575. He indicated Plaintiff would benefit from a weight management program, but Plaintiff declined to participate. Tr. at 576.

X-rays of Plaintiff's bilateral knees showed minimal degenerative changes in the medial compartments on June 23, 2011. Tr. at 349. X-rays of Plaintiff's bilateral hips indicated mild degenerative changes. Tr. at 351.

Plaintiff presented to Joseph Casagrande, Ph. D. ("Dr. Casagrande"), for an initial psychological interview on July 6, 2011. Tr. at 557. He endorsed symptoms of adjustment disorder and indicated a history of conflict with authority figures. *Id.* He indicated he had a high IQ, but was stubborn and standoffish. Tr. at 557–58. Dr.

Casagrande observed Plaintiff to demonstrate a moderate degree of depression with avoidant and passive-aggressive patterns. Tr. at 558. Plaintiff endorsed a history of post-traumatic stress disorder ("PTSD"), but Dr. Casagrande indicated the diagnosis of PTSD did not "appear particularly cogent by present clinical picture." *Id.* Dr. Casagrande indicated Plaintiff was well-oriented; had good contact with reality; demonstrated adequate memory; showed no psychomotor retardation; endorsed no sleep or appetite disorder; and denied suicidal or homicidal ideations, hallucinations, and delusions. *Id.* He further noted that Plaintiff's presentation was initially defensive; that his mood was moderately dysphoric; that his social judgment was poor; and that his insight was labored. *Id.* Plaintiff's score on the Beck Depression Inventory II indicated moderate symptoms of depression. Tr. at 559. Dr. Casagrande assessed depression, not otherwise specified ("NOS") and encouraged Plaintiff to follow up with the psychiatrist for consideration of pharmacologic intervention. Tr. at 558.

Plaintiff presented to Walter J. Finnegan, M.D. ("Dr. Finnegan"), for an orthopedic consultation on July 25, 2011. Tr. at 398–401. He complained that joint pain in his hips and knees had necessitated his use of a cane on his right side. Tr. at 398–99. Plaintiff indicated he did a limited amount of sedentary work on computers. Tr. at 399. Dr. Finnegan observed Plaintiff to have satisfactory ankle motion; knee range of motion ("ROM") ranging from 5 to 105 degrees bilaterally; mild patellofemoral crepitation on the right more than the left; intact ligaments; and no effusions or joint line tenderness. Tr. at 400. Plaintiff demonstrated good ROM of his hips and only complained of pain at the end-range of the ROM testing. *Id.* Dr. Finnegan diagnosed minimal degenerative arthritis

7

of the bilateral hips, minimal degenerative arthritis involving the medial compartments of both knees, and bilateral chondromalacia patella. *Id.* He indicated a need to rule out the presence of a loose body in Plaintiff's right hip and a surgically-remediable pathology in the right hip and bilateral knees. *Id.* He suggested Plaintiff had a weight management disorder and noted that Plaintiff was 6'3" tall, weighed 313 pounds, and had a BMI of 39. Tr. at 399, 400. He recommended Plaintiff undergo an MRI. Tr. at 400–01.

Plaintiff presented to Frank W. Favazza, M.D. ("Dr. Favazza"), for a psychiatric assessment on July 25, 2011. Tr. at 550–52. He endorsed feelings of frustration and disillusionment because he did not believe his symptoms were being adequately addressed by his medical team. Tr. at 550. Plaintiff indicated his girlfriend had recently ended their relationship and that he worked only occasionally as a handyman and computer repairman. *Id.* Dr. Favazza indicated Plaintiff smiled readily and responded to inquiry. Tr. at 551. Plaintiff demonstrated normal speech, euthymic mood, appropriate affect, normal thought processes, and normal thought content. *Id.* Dr. Favazza diagnosed adjustment disorder secondary to general medical condition and assessed a global assessment of functioning ("GAF")[2] score of 65. *Id.* He noted that Plaintiff was opposed

---

[2] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.* The record contains GAF scores that range from 58 to 65. *See* Tr. at 530, 541, 591, 596, 718, 786, 800, 806, 821, 851, 891, 996, 1006, 1012, 1132, 1149, 1169, 1188, 1201, 1230, 1236, 1265, 1317. A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and

to pharmacologic intervention and that he did not consider medication to be essential. *Id.* He suggested Plaintiff follow up with Dr. Casagrande. Tr. at 552.

On August 14, 2011, an MRI of Plaintiff's right hip showed no fracture or avascular necrosis. Tr. at 298. MRIs of Plaintiff's bilateral knees showed mild patellar chondromalacia. Tr. at 299, 300.

Dr. Whitson indicated he conferred with Plaintiff over the telephone on August 19, 2011, regarding his MRI results. Tr. at 543. Dr. Whitson indicated to Plaintiff that there was no need to refer him back to an orthopedist because neither his x-rays nor his MRIs showed any significant pathology. *Id.* Plaintiff indicated he was having difficulty sleeping and requested that Dr. Whitson prescribe a stronger pain medication for him to take at night. *Id.* Dr. Whitson prescribed Vicodin, but indicated he would not further increase the level of pain medications because he could find no clinical source of significant pain. *Id.* He suggested that Plaintiff's pain may be affected by psychological factors. *Id.*

On September 2, 2011, Dr. Casagrande noted that Plaintiff sought problem-solving and psychosocial support services to avoid patterns of helplessness. Tr. at 535. Plaintiff did not endorse marked disruptions in sleep or appetite. *Id.* Dr. Casagrande assessed Plaintiff's intellect as above-average. *Id.* He found Plaintiff to be alert and well-

---

occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR.* A GAF score of 61–70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, [and] has some meaningful interpersonal relationships." *Id.*

oriented; to have good reality contact; to present as spontaneous and coherent; and to have adequate memory. *Id.* He indicated Plaintiff's affect was constricted and his mood was mildly-to-moderately dysphoric. *Id.* Plaintiff demonstrated no psychomotor retardation and endorsed no suicidal or homicidal ideations, hallucinations, or delusions. *Id.* Dr. Casagrande stated Plaintiff's social judgment was "problematically impaired," his insight was labored, and his motivation was mixed. *Id.* He assessed adjustment disorder with depressive features and instructed Plaintiff to return to the clinic in two to three months. *Id.* He indicated Plaintiff had a GAF score of 60. Tr. at 541.

Plaintiff presented for an optometry consultation on September 2, 2011. Tr. at 536–41. Patrick McLaren, O.D. ("Dr. McLaren"), diagnosed mild non-proliferative diabetic retinopathy in the right eye and epiretinal membrane over the left macula. Tr. at 537. Dr. McLaren encouraged Plaintiff to gain better control over his diabetes to achieve an improved long-term prognosis. Tr. at 588.

On October 20, 2011, Plaintiff visited David J. Yatsonsky, M.D. ("Dr. Yatsonsky"), for a compensation and pension examination in connection with his application for disability benefits through the Veterans Administration ("VA"). Tr. at 520–35. Dr. Yatsonsky indicated Plaintiff had been diagnosed with bilateral chondromalacia of patella and osteoarthritis in his lower legs. Tr. at 521. He observed Plaintiff's bilateral knee flexion to be painful at 60 degrees and limited to 95 degrees.[3] Tr. at 522–23. Plaintiff was unable to extend his knees or perform repetitive use testing. Tr. at 522–24. Dr. Yatsonsky indicated Plaintiff had the following functional loss or

---

[3] The record indicates normal knee flexion is to 140 degrees. Tr. at 522.

functional impairment to his knees and lower legs: pain on movement; disturbance of locomotion; and interference with sitting, standing, and weightbearing. Tr. at 525. He observed Plaintiff to have tenderness or pain to palpation of the joint line or soft tissues of both knees, positive right knee crepitus, and bilateral discomfort with varus and valgus pressure. Tr. at 526, 530. Plaintiff demonstrated normal muscle strength with bilateral knee flexion and extension and normal joint stability. Tr. at 526–27. Dr. Yatsonsky indicated Plaintiff regularly used a cane as a normal mode of locomotion. Tr. at 530. He stated that Plaintiff "notes throughout the day his knees bother him from prolonged standing." Tr. at 534.

Plaintiff followed up with Dr. Whitson on October 24, 2011. Tr. at 510. He was concerned about his testosterone level, but Dr. Whitson informed him that he was "looking too hard for something to worry about." *Id.* Dr. Whitson noted Plaintiff's A1c had decreased to 7.8 percent and that his blood sugar was under better control, but that Plaintiff was self-medicating with short-acting insulin around meal times. *Id.* He indicated Plaintiff had gained weight and was noncompliant with his diet. *Id.* He encouraged Plaintiff to follow a heart-healthy, low sugar, low carbohydrate diet and to focus on portion control and weight loss. Tr. at 511. He stated he worried about Plaintiff "being a little bit neurotic about his health when it is not doing anything helpful" and searching for tests that might validate his worrying. *Id.* Dr. Whitson observed decreased sensation to monofilament nylon and healing sores on Plaintiff's anterior shins, but noted no other abnormalities. Tr. at 513. He indicated Plaintiff's hypertension, hypothyroidism, and hyperlipoproteinemia were under reasonable control; that his diabetes was under

poor control; and that his adjustment disorder was probably worse because of his concerns about medical issues, noncompliance, and the fact that he was adjusting his medications without medical direction. Tr. at 514.

Plaintiff presented for a podiatry consultation on November 7, 2011. Tr. at 381–82. He reported he did not wear socks because they caused calf pain and indentations when his lower extremities swelled. Tr. at 382. Mary E. Robinson, DPM, observed healing eschar and healed lesions, but noted no other abnormalities. Tr. at 381–83.

Plaintiff presented to Cindy S. Wright, D.O. ("Dr. Wright"), for a comprehensive orthopedic examination on June 29, 2012. Tr. at 716–22. He indicated that his knee pain prevented him from standing for more than 15 to 20 minutes at a time and from walking more than 200 feet. Tr. at 716. He also complained of right hip pain that was exacerbated by walking, standing, and sitting. *Id.* Plaintiff indicated he had used a cane in the past, but lost it when he moved from Pennsylvania to South Carolina. *Id.* He complained of dull pain in his right shoulder. Tr. at 717. Plaintiff indicated he was capable of dressing, bathing, feeding, cooking, cleaning, and shopping while using a cart. *Id.* Dr. Wright observed that Plaintiff was able to get on and off the exam table without assistance. *Id.* Plaintiff's blood pressure was elevated at 168/84. *Id.* He was 74 inches tall and weighed 292 pounds. *Id.* He had 2+ pitting edema in his lower extremities. Tr. at 718. He had a diabetic rash on his anterior lower extremities. *Id.* Dr. Wright noted tenderness to palpation in Plaintiff's bilateral knees and on his right shoulder acromioclavicular joint. *Id.* She observed mild edema in Plaintiff's left knee. *Id.* Plaintiff was able to tandem walk, but he demonstrated poor balance and a slow pace. *Id.* He was able to heel-toe walk

and performed half of a squat. *Id.* His gait demonstrated a mild limp, but a good pace without use of an assistive device. *Id.* Plaintiff had normal muscle strength in his bilateral upper and lower extremities. Tr. at 719. Plaintiff demonstrated abnormal ROM in cervical spine extension, lumbar flexion, right shoulder abduction, left shoulder external rotation, bilateral knee flexion, right hip abduction, bilateral hip flexion, and bilateral ankle plantar flexion. Tr. at 721. Plaintiff was unable to adequately perform the straight-leg raising tests because of bilateral knee pain and could not maintain 90 degrees of hip flexion for Dr. Wright to measure his hip rotation. Tr. at 719. Dr. Wright diagnosed chronic bilateral knee pain, chronic bilateral hip pain, obesity, history of right rotator cuff injury, chondromalacia patella of the bilateral knees, non-insulin dependent diabetes, hypertension, hyperlipidemia, sleep apnea, depression, erectile dysfunction, peripheral edema, and hypothyroidism. Tr. at 719–20.

On July 24, 2012, state agency consultant Kathleen Broughan, Ph. D., reviewed the evidence and completed a psychiatric review technique form ("PRTF"). Tr. at 65–66. She assessed affective disorders as a non-severe impairment and found that Plaintiff had no restrictions and had experienced no episodes of decompensation. Tr. at 65.

State agency medical consultant Jean Smolka, M.D., completed a physical residual functional capacity ("RFC") assessment on July 24, 2012, and determined Plaintiff could perform work with the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour day; sit for about six hours in an eight-hour day; push and/or pull limited to frequent in the lower extremities and right upper extremity; occasionally climb ramps/stairs, stoop,

kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; and avoid concentrated exposure to hazards. Tr. at 67–69.

Plaintiff presented to Lisa K. Van Moll, M.D. ("Dr. Van Moll"), to establish primary care on July 26, 2012. Tr. at 874. His hemoglobin A1c was elevated at 9.0 percent. Tr. at 879. He reported knee pain and requested that his cane be replaced. *Id.* Dr. Van Moll increased Plaintiff's Glargine insulin from 40 to 45 units at bedtime, discontinued Metformin and Humulin N ("NPH"), and prescribed Aspart insulin to be taken three times a day with meals. *Id.* She discontinued Simvastatin and prescribed Crestor because Plaintiff's lipids were high. *Id.* She diagnosed venous insufficiency and referred Plaintiff for compression stockings. *Id.* She also referred Plaintiff for counseling to address adjustment disorder and to an endocrinologist to assess his hormone levels. *Id.*

Plaintiff presented for a diabetic teleretinal imaging consultation on July 28, 2012. Tr. at 767. Left and right retinal images showed moderate nonproliferative diabetic retinopathy. *Id.*

Plaintiff presented to Michael C. Behrens, Pharm. D. (Dr. Behrens"), for evaluation of his blood glucose and diabetes management on August 13, 2012. Tr. at 852. He complained of gastrointestinal upset with use of Metformin IR. *Id.* Dr. Behrens indicated Plaintiff's hemoglobin A1c was above his goal and his afternoon and evening blood sugars were elevated. Tr. at 857. He increased Plaintiff's Aspart insulin to seven units three times a day with meals and prescribed Metformin SA. Tr. at 857–58.

On August 14, 2012, Plaintiff presented to Justin L. Quattlebaum, Ph. D. ("Dr. Quattlebaum"), for evaluation and treatment of panic and anxiety. Tr. at 846. Plaintiff

endorsed symptoms that included physiological anxiety symptoms, claustrophobia, and frequent worry over environmental stressors. *Id.* Dr. Quattlebaum described Plaintiff as anxious, but happy, and noted no other abnormalities on the mental status exam. Tr. at 850. Plaintiff agreed to engage in cognitive behavioral therapy. Tr. at 846. Dr. Quattlebaum diagnosed anxiety disorder, NOS and indicated a need to rule out PTSD. Tr. at 850. He assessed a GAF score of 60. Tr. at 851.

On August 22, 2012, a computed tomography ("CT") scan of Plaintiff's pelvis showed an unremarkable liver, gallbladder, and pancreas. Tr. at 727–28. It indicated mild prostatomegaly, but no suspicious lytic or blastic bony lesions or etiology for Plaintiff's elevated alkaline phosphatase. Tr. at 728.

Plaintiff presented to Humera Chaudhary, M.D. ("Dr. Chaudhary"), for an endocrinology consultation on August 22, 2012. Tr. at 759. Dr. Chaudhary indicated Plaintiff's testosterone levels were normal and his prolactin levels were nearly normal. Tr. at 761. She ordered a repeat of Plaintiff's lab work and indicated she would discharge him to primary care if his levels were normal. *Id.*

On August 28, 2012, Plaintiff reported multiple social, financial, and family stressors. Tr. at 827–28. Dr. Quattlebaum indicated he provided psychoeducation and discussed behavioral activation and cognitive reframing. Tr. at 828. He referred Plaintiff to a social worker for possible connection with area resources. *Id.* Aside from an indication that Plaintiff's mood was "not great," Dr. Quattlebaum indicated Plaintiff had normal mental status. Tr. at 829–30.

On September 5, 2012, Plaintiff complained of claustrophobia. Tr. at 818–19. He indicated he experienced panic-like symptoms after attempting to repair a broken water pipe beneath his trailer. Tr. at 819. Dr. Quattlebaum encouraged Plaintiff to increase his participation in pleasurable events and to reduce negative thought patterns. *Id.* He noted no abnormalities on a mental status examination. Tr. at 820–21. He indicated Plaintiff had notable environmental stressors and some characterological traits that were "less likely to change." Tr. at 821. He planned to briefly treat Plaintiff with cognitive behavioral therapy that targeted a reduction of anxiety and worry through behavioral activation and cognitive restructuring. *Id.* He diagnosed anxiety disorder, NOS and assessed a GAF score of 60. *Id.* He indicated that Plaintiff may benefit from taking antidepressant medication. Tr. at 822.

Plaintiff followed up with Dr. Behrens on September 6, 2012. Tr. at 812. Dr. Behrens noted that Plaintiff's afternoon and evening blood sugars were running high. Tr. at 815. He increased Plaintiff's dosage of Aspart insulin to 10 units three times a day and his dosage of Metformin SA to 1000 milligrams twice a day. Tr. at 816.

Plaintiff reported improvement in his relationship with his wife on September 19, 2012. Tr. at 803. He stated he was planning to register for classes. *Id.* Dr. Quattlebaum indicated that the majority of the session was spent discussing cognitive restructuring techniques and distortions. *Id.* Plaintiff indicated his level of functioning had significantly improved. Tr. at 803–04. A mental status examination was normal. Tr. at 805. Dr. Quattlebaum assessed a GAF score of 60. Tr. at 806.

On September 19, 2012, Dr. Behrens increased Plaintiff's dosage of Aspart insulin to 12 units three times a day with meals because his afternoon and evening blood sugar readings remained elevated. Tr. at 951–52.

On October 3, 2012, Plaintiff indicated to Dr. Quattlebaum that his wife thought he was moody and withdrawn. Tr. at 798. He expressed concern about his physical health and fluctuations in his testosterone and prolactin levels. *Id.* Dr. Quattlebaum discussed with Plaintiff how his situation could be worse in an attempt to change his perspective. *Id.* A mental status examination was normal. Tr. at 799–800. Dr. Quattlebaum assessed a GAF score of 60. Tr. at 800.

On October 17, 2012, Plaintiff informed Dr. Quattlebaum that he was doing better. Tr. at 783. He indicated his relationship with his wife had improved and that he was becoming upset less frequently. *Id.* A mental status examination was normal. Tr. at 785. Dr. Quattlebaum indicated he would consider terminating counseling services after Plaintiff's next visit. Tr. at 783. He assessed a GAF score of 62. Tr. at 786.

On October 25, 2012, Dr. Behrens decreased Plaintiff's dosage of Glargine because his fasting blood sugars were below the goal range. Tr. at 1016. He increased Plaintiff's dosage of Aspart to address Plaintiff's high afternoon and evening blood sugar readings. *Id.*

On October 31, 2012, Plaintiff reported that he was better coping with stress, but that he continued to struggle at times. Tr. at 1010. Dr. Quattlebaum reviewed reframing strategies with Plaintiff and provided alternative perspectives. *Id.* Plaintiff indicated he was using adaptive strategies to stop rumination and his depressive spiral. *Id.* Dr.

17

Quattlebaum noted that Plaintiff's thought processes were somewhat tangential, but that his mental status examination was otherwise normal. Tr. at 1011–12. He assessed a GAF score of 64. Tr. at 1012.

On November 14, 2012, Plaintiff reported to Dr. Quattlebaum that he was depressed. Tr. at 1003. Dr. Quattlebaum indicated Plaintiff was notably tangential during the session and spent the majority of the time "recounting minor irritants that became major irritants." *Id.* Plaintiff's mental status examination was otherwise normal. Tr. at 1005. Dr. Quattlebaum assessed a GAF score of 60. Tr. at 1006.

On November 28, 2012, Plaintiff indicated complained of problems with his wife and poor sleep with frequent awakenings. Tr. at 993–94. Dr. Quattlebaum discussed adaptive cognitive reframing and emotional regulatory strategies with Plaintiff. Tr. at 994. He noted Plaintiff's thought processes were somewhat tangential, but that his mental status examination was otherwise normal. Tr. at 995. He assessed a GAF score of 58. Tr. at 996.

On November 29, 2012, Plaintiff indicated to Dr. Behrens that increased stress at home had caused elevations in his blood pressure and glucose. Tr. at 1158.

Plaintiff followed up with Dr. Von Moll on December 4, 2012, for skin tag removal, diabetes maintenance, and pain in his right hip and knee. Tr. at 1154. Dr. Von Moll indicated Plaintiff's hemoglobin A1c was 9.0 percent and that he had gained 17 pounds. Tr. at 1156.

On December 5, 2012, Plaintiff informed Dr. Quattlebaum that his relationship with his wife had improved and that they were considering couple's counseling. Tr. at

1146–47. Dr. Quattlebaum indicated he would refer the case to Dr. Baddeley. Tr. at 1147. Plaintiff discussed health issues that were a source of stress, but Dr. Quattlebaum reminded him that he was not as helpless to control his diabetes-related impairments as he claimed to be. *Id.* Dr. Quattlebaum assessed a GAF score of 60. Tr. at 1149.

On December 18, 2012, Plaintiff indicated he had a stressful week. Tr. at 1133. He stated his wife became angry with him for speaking with another woman at a church social function. Tr. at 1134. Dr. Quattlebaum indicated Plaintiff was very tangential and required redirection several times. *Id.* He reviewed emotional regulatory strategies and encouraged Plaintiff to use behavioral activation. *Id.*

On January 2, 2013, Plaintiff reported to Dr. Quattlebaum that he felt "emotionally gutted" because of conflict with his wife and daughter and the fact that they did not include him in their Christmas plans. Tr. at 1129. Plaintiff's mood was poor, but his mental status examination was otherwise normal. Tr. at 1131. Dr. Quattlebaum assessed a GAF score of 60. Tr. at 1132.

Plaintiff presented to the emergency room ("ER") at Georgetown Hospital with abdominal pain on January 6, 2013. Tr. at 1063. A CT scan of his abdomen and pelvis indicated hepatomegaly, splenomegaly, and inguinal hernia. Tr. at 1050. The attending physician diagnosed pancreatitis and gastroenteritis. Tr. at 1052. Plaintiff returned to the ER the next morning with a fever. Tr. at 1100. He was discharged to his home, but instructed to return later in the morning for an ultrasound. *Id.*

Plaintiff presented to James E. Turek, M.D. ("Dr. Turek"), for a consultative examination on January 10, 2013. Tr. at 889–91. He complained of knee pain that was

worse on the right than on the left, diabetic sensory neuropathy in his feet, and right hip arthritis. Tr. at 889. He endorsed right shoulder pain and adjustment disorder. *Id.* Dr. Turek indicated Plaintiff was 74 inches tall and weighed 315 pounds. Tr. at 890. He observed crepitus in Plaintiff's bilateral shoulders. *Id.* Plaintiff had normal bulk and tone in his lower extremities and good ROM of his hips, knees, and ankles. *Id.* Dr. Turek indicated Plaintiff got on and off the exam table and ambulated throughout the clinic without problems. *Id.* Plaintiff had 5+ motor strength and 1+ deep tendon reflexes. Tr. at 891. He demonstrated decreased sensation to light touch from his lower foot to his lower shin. *Id.* An x-ray of Plaintiff's right hip showed no abnormalities. Tr. at 892. An x-ray of his right knee indicated mild degenerative changes. Tr. at 893. Dr. Turek's diagnostic impressions were poorly-controlled diabetes; diabetic neuropathy of the lower extremities; history of chondromalacia patella; history of degenerative joint disease; obesity; and history of PTSD. Dr. Turek indicated that, although Plaintiff stated he was limited by pain in his knees and hips, it appeared "that he can ambulate fine." *Id.* He noted that Plaintiff's diabetes was "in poor control" and that neuropathy and inflammation from high sugar "may be a source of his discomfort." *Id.* Dr. Turek advised Plaintiff to lose weight and to better track his blood pressure. *Id.* He indicated Plaintiff was capable of handling his own financial and medical decisions. *Id.*

On January 23, 2013, Plaintiff complained of increased anxiety related to his gastrointestinal problems and indicated his relationship with his wife was "icy." Tr. at 1199. Dr. Quattlebaum described Plaintiff as talkative, but evasive. Tr. at 1201. All other

aspects of the mental status examination were normal. Tr. at 1200–01. Dr. Quattlebaum assessed a GAF score of 60. Tr. at 1201.

On February 6, 2013, Plaintiff informed Dr. Quattlebaum that his mood had improved because he was getting along with his wife. Tr. at 1186. Dr. Quattlebaum encouraged Plaintiff to make changes to improve his future relationship with his wife. *Id.* He assessed a GAF score of 65. Tr. at 1188.

State agency consultant Michael Neboschick, Ph. D., reviewed the evidence and completed a PRTF on February 12, 2013. Tr. at 91–92. He classified Plaintiff's affective disorder as a non-severe impairment. Tr. at 91. He rated as "mild" Plaintiff's restriction of activities of daily living ("ADLs"), difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. *Id.* He indicated Plaintiff had no repeated episodes of decompensation. *Id.*

State agency medical consultant S. Farkas, M.D., also reviewed the medical evidence on February 12, 2013, and assessed Plaintiff's RFC. Tr. at 93–96. He indicated Plaintiff could occasionally lift and/or carry 20 pounds; could frequently lift and/or carry 10 pounds; could stand and/or walk for about six hours in an eight-hour workday; could sit for about six hours in an eight-hour workday; could frequently push and pull with her lower extremities and with her right upper extremity; could occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; could never climb ladders/ropes/scaffolds; and should avoid concentrated exposure to hazards and unprotected heights. *Id.*

Plaintiff presented to Joseph G. Baltz, Jr., M.D. ("Dr. Baltz"), for an evaluation of hepatomegaly and elevated liver enzymes on February 14, 2013. Tr. at 1171–78. Dr.

21

Baltz indicated an ultrasound showed Plaintiff to have marked splenomegaly and hepatomegaly, as well as hyperechogenicity consistent with diffuse liver disease and probable fatty infiltration. Tr. at 1172. He indicated that non-alcoholic steatohepatitis ("NASH") was likely the source of Plaintiff's elevated transaminases, given Plaintiff's body habitus and history of diabetes, hypertension, and hyperlipidemia. Tr. at 1177. He indicated he would perform basic hepatitis testing to rule out other causes. *Id.* He stated that Plaintiff's low platelets and splenomegaly may be indicative of cirrhosis. Tr. at 1178. He recommended Plaintiff be scheduled for colonoscopy, esophagogastroduodenoscopy ("EGD"), and liver biopsy. *Id.*

Plaintiff visited Dr. Quattlebaum on February 20, 2013, and expressed some anxiety regarding his liver functioning. Tr. at 1166. Dr. Quattlebaum discussed with Plaintiff the possible outcomes of testing. *Id.* He encouraged Plaintiff to use adaptive coping strategies and to actively reframe the situation. *Id.* He indicated he would continue Plaintiff's cognitive behavioral therapy to target a reduction in worry and rumination. Tr. at 1169. He assessed a GAF score of 65. *Id.*

Plaintiff underwent EGD and colonoscopy on March 12, 2013. Tr. at 1244–46. The EGD showed inflammation of Plaintiff's esophagus. Tr. at 1233.

Plaintiff reported anxiety related to his pending medical test results on March 19, 2013. Tr. at 1233. He indicated he had successfully used distraction techniques to reduce anxiety, and Dr. Quattlebaum encouraged him to use diaphragmatic breathing and cognitive reframing. Tr. at 1233–34. Dr. Quattlebaum observed no abnormalities on a mental status exam and assessed Plaintiff's GAF score to be 65. Tr. at 1235–36.

On April 9, 2013, Plaintiff indicated to Dr. Quattlebaum that his relationship with his wife had soured and that he was worried about his potential need for a liver transplant. Tr. at 1227–28. Dr. Quattlebaum reminded Plaintiff that he did not know if he would need a liver transplant and that he should stop considering it as something that was inevitable. Tr. at 1228. He indicated that Plaintiff's perspective was that of "reduced agency" and that Plaintiff became defensive when he suggested otherwise. *Id.* He assessed a GAF score of 65. Tr. at 1230. Dr. Quattlebaum indicated that treatment had plateaued and that Plaintiff may benefit from medication and less frequent therapy in Myrtle Beach. Tr. at 1228. He subsequently discharged Plaintiff. Tr. at 1231.

On April 10, 2013, Tara W. Beldner, Pharm. D. ("Dr. Beldner"), increased Plaintiff's dosage of Aspart to 18 units with breakfast and dinner and instructed Plaintiff to test his blood sugar before meals three to four times per week. Tr. at 1225.

Plaintiff attended a primary care visit with Talita Ikahihifo, M.D. ("Dr. Ikahihifo"), on April 22, 2013. Tr. at 1216. He reported that he had been more compliant with his diet and insulin regimen. Tr. at 1217. He complained of paresthesias, numbness, and pins-and-needles sensation in his bilateral feet. Tr. at 1219. He endorsed pain in his hips, knees, and ankles that was exacerbated by weight bearing and cold weather. *Id.* He indicated he also experienced anxiety. *Id.* Dr. Ikahihifo observed tenderness over Plaintiff's liver and anterior knees. Tr. at 1220.

Plaintiff underwent a liver biopsy on May 6, 2013. Tr. at 1203–04.

On May 14, 2013, Plaintiff presented to Dr. Ikahihifo with a complaint of right-sided abdominal pain. Tr. at 1278. He indicated the pain began three to four weeks earlier

and was exacerbated by movement. *Id.* Dr. Ikahihifo ordered a CT of Plaintiff's abdomen. Tr. at 1281.

Plaintiff presented to Jacob Whelan, M.D. ("Dr. Whelan"), on May 23, 2013, to discuss his liver biopsy results. Tr. at 1265. He indicated the liver biopsy showed stage 2–3 fibrosis and chronic hepatitis. Tr. at 1266. He diagnosed NASH and indicated he would treat it as cirrhosis. Tr. at 1270. He indicated Plaintiff should work with his primary care physician to improve his diabetes, which he hoped would slow the steatosis. *Id.*

On May 31, 2013, Plaintiff presented to Dr. Ikahihifo after experiencing a dizzy sensation while walking his dog. Tr. at 1254. Dr. Ikahihifo ordered an electrocardiogram, and Plaintiff's results were normal. Tr. at 1257. She advised Plaintiff to stay hydrated and indicated she would order a Holter monitor if Plaintiff had additional incidents. *Id.*

Plaintiff presented to Richard Fahy, M.D. ("Dr. Fahy"), on May 31, 2013, for a mental health diagnostic assessment. Tr. at 1259. Dr. Fahy indicated Plaintiff was quite anxious about his hepatitis diagnosis and a possible future need for a liver transplant. *Id.* Although Plaintiff endorsed a history of treatment for PTSD following a car accident in 1992, Dr. Fahy indicated his current presentation did not reflect symptoms of PTSD. *Id.* Plaintiff reported feeling depressed and overwhelmed at times. *Id.* Dr. Fahy indicated Plaintiff showed no evidence of psychosis, schizophrenia, bipolar disorder, or serious mood disorder. Tr. at 1259–60. He noted the following abnormalities on mental status examination: worried and apprehensive mood; anxious affect; thought process reflecting mild obsessive compulsive disorder and attention deficit hyperactivity disorder; and fair insight. Tr. at 1264. He assessed mixed adjustment disorder and a GAF score of 60. Tr. at

1265. He indicated Plaintiff did not need psychotropic medications and referred him for counseling. *Id.*

On July 1, 2013, Plaintiff reported to John Montague, LMSW ("Mr. Montague"), for counseling. Tr. at 1316–17. He reported symptoms that included sleep disturbance, low energy, anger, and sadness. Tr. at 1318. Mr. Montague indicated Plaintiff had a depressive disorder and assessed a GAF score of 60. Tr. at 1317.

Plaintiff presented to Elizabeth Hamilton, Pharm. D. ("Dr. Hamilton"), on July 23, 2012, to discuss his diabetes management. Tr. at 1312. Dr. Hamilton indicated Plaintiff was experiencing hypoglycemia after his evening meal and showed higher blood sugar readings following his liver biopsy. Tr. at 1315. She increased Plaintiff's pre-meal dosage of Aspart to 18 units. *Id.* She indicated Plaintiff could take between 15 and 20 units before his evening meal and should adjust his insulin based on his blood sugar reading and the type of evening meal he planned to eat. *Id.*

On July 11, 2013, Plaintiff complained to Dr. Ikahihifo that Tramadol was not adequately controlling his pain. Tr. at 1310. Dr. Ikahihifo prescribed Oxycodone. *Id.*

On July 18, 2013, Dr. Beldner increased Plaintiff's Aspart dosage to 21 units before dinner. Tr. at 1308. Plaintiff requested to meet with a dietary counselor, and Dr. Beldner communicated the request. *Id.*

Plaintiff again consulted Dr. Fahy on July 31, 2013. Tr. at 1371. Dr. Fahy indicated he would prescribe Diazepam for Plaintiff's upcoming dental visit. *Id.* He recognized that Plaintiff was generally an anxious person, but indicated his anxiety was

not significant enough to require regular medication. *Id.* He stated Plaintiff had no evidence of depression. *Id.*

Plaintiff followed up with Dr. Hamilton on August 27, 2013. Tr. at 1361. He indicated he was attempting to make better food choices, but stated he had been limited to eating soft foods because of recent dental work. *Id.* Dr. Hamilton advised Plaintiff to continue to monitor his fasting blood sugar and to maintain the same medication regimen. Tr. at 1364.

On September 13, 2013, Plaintiff presented to Panayiotis Greventis, M.D. ("Dr. Greventis"), for gastroenterology follow up. Tr. at 1350–54. Plaintiff and his wife reported that he had recently experienced mood variability and word-finding issues. Tr. at 1351. He reported pain in his back and knees and occasional pain and swelling in his right upper quadrant. *Id.* He also complained of a deep, dry cough. *Id.* Dr. Greventis observed mild tenderness in Plaintiff's right upper quadrant and 1+ edema in his shin. Tr. at 1354. He indicated Plaintiff likely had mild hepatic encephalopathy. *Id.* He recommended Plaintiff proceed with Lactulose treatment to improve his word-finding and mood. *Id.* He increased Plaintiff's dosage of Propranolol to 20 milligrams three times per day to prevent variceal bleeding. *Id.*

Plaintiff also presented to Kimberly Wahl, Pharm. D. ("Dr. Wahl"), for diabetes medication management on September 13, 2013. Tr. at 1354–60. Dr. Wahl indicated Plaintiff's hemoglobin A1c was near goal and congratulated Plaintiff on improving his diet. Tr. at 1359. She advised Plaintiff to stop Metformin because of his NASH diagnosis and possible complications. *Id.*

26

Plaintiff complained of increased pain in his hips and knees and requested that he be referred to an orthopedist on October 11, 2013. Tr. at 1340–41. He also reported pain that radiated from his right shoulder through the fingers on his right hand and caused him to drop items. Tr. at 1341.

Plaintiff followed up with Dr. Wahl on October 17, 2013. Tr. at 1334. He indicated he had resumed Metformin because his fasting blood sugar had increased when he discontinued it. *Id.* Plaintiff indicated he was eating poorly because of stress related to his relationship and financial situation. *Id.* Plaintiff's fasting glucose was within the normal range, but his non-fasting glucose was elevated. *Id.* Dr. Wahl indicated Plaintiff's hemoglobin A1c was significantly elevated at 9.3 percent. Tr. at 1338. She recommended Plaintiff again discontinue Metformin because of its risk to his liver and increase Aspart to compensate for it. *Id.*

Plaintiff was admitted to Waccamaw Community Hospital on May 7, 2014, for abdominal pain, nausea, and vomiting. Tr. at 1376. A CT scan showed a slightly distended bowel, but no frank obstructive change; a very mild ileus; and hepatomegaly and splenomegaly. Tr. at 1380. A chest x-ray indicated hypoventilatory changes without superimposed active process and a four to eight millimeter noncalcified nodule in the right midlung field. Tr. at 1382.

C.       The Administrative Proceedings

1.       The Administrative Hearing

a.       Plaintiff's Testimony

At the hearing on June 26, 2014, Plaintiff testified that he last worked in July of either 2005 or 2007. Tr. at 37. He indicated he packed candy and ran a processing line for a candy manufacturer for six to seven months. *Id.* He stated he worked for three years as a telephone support representative for T-Mobile. Tr. at 38. He indicated he worked off-and-on for about a year on a program for technical computer training for an educational company. Tr. at 39. He stated that the owner of the company decided not to proceed with implementation of the program. *Id.* He indicated he also worked as an adjunct professor. Tr. at 44.

Plaintiff testified he experienced side effects from his medications that included diarrhea, constipation, drowsiness, confusion, and slowed response. Tr. at 40. He stated he often used the restroom six or seven times per day. *Id.*

Plaintiff testified the strength and feeling in his hands was reduced as a result of neuropathy. Tr. at 41. He indicated he could not open jars. *Id.* He testified he was released from his job at T-Mobile because his typing speed had slowed and he could no longer handle calls as quickly. Tr. at 42. He stated he had problems with his shoulder that resulted from a car accident years earlier. Tr. at 41–42. He indicated his shoulder pain affected his abilities to lift and to work overhead. Tr. at 43.

Plaintiff testified that he had problems with his digestive system. Tr. at 48. He indicated he frequently ate small meals because of gastroparesis. *Id.* He stated he had a

twist in his upper intestine and NASH. *Id.* He indicated his liver was swollen, partially encapsulated, and had fibrosis and cirrhosis. *Id.* He stated he experienced significant pain that was treated with Vicodin three times per day. Tr. at 49. He indicated his pain was exacerbated by movement, stooping, bending, and eating. *Id.*

Plaintiff testified that he was easily agitated. Tr. at 50. He indicated he no longer reacted to situations like he had in the past. Tr. at 51. He stated he had night terrors that occurred with varied frequency. Tr. at 52. He indicated he was able to go back to sleep quickly on some occasions, but was afraid to go back to sleep on other occasions. *Id.*

Plaintiff indicated that his diabetes caused cataracts and neuropathy in his feet and hands. Tr. at 51. He indicated he was 6'3" tall and weighed 295 pounds. Tr. at 52.

Plaintiff testified he was most comfortable in a semi-reclined position. Tr. at 44. He indicated he could sit in a non-reclined position for only 30 minutes to an hour at a time because of pain in his hips and back. *Id.* He stated he could stand for 10 to 20 minutes, but must lean on his cane. *Id.* He indicated he would be unable to return to a teaching job because he could not find a comfortable position. Tr. at 45. He stated he had used a cane off-and-on for 15 years because of hip and knee pain and difficulty balancing. Tr. at 48.

Plaintiff testified that he used medication to sleep and a BiPAP machine for sleep apnea. Tr. at 46. He indicated he slept for short periods and had difficulty resuming sleep after being awakened. *Id.* He stated he no could no longer afford to own a vehicle or even to replace his driver's license and expressed doubt that he would be able to drive because of difficulty sitting. *Id.*

Plaintiff testified that he had fallen through the floor of his trailer. Tr. at 47. He stated he had attempted to make repairs, but was only able to work for a few minutes at a time. *Id.* He indicated he could only mow 15 to 20 feet of his yard per day. *Id.* He stated he was able to shop for groceries, but experienced shortness of breath when pushing a shopping cart. *Id.* He indicated he typically used a ride-on cart in Walmart. *Id.*

b.     Witness's Testimony

Plaintiff's wife Julia Littlehale testified at the hearing. Tr. at 54–56. She stated she had been married to Plaintiff for over 30 years. Tr. at 55. She stated Plaintiff no longer had the energy he had in the past and had to stop to rest while performing any lengthy exertional tasks. *Id.* She testified Plaintiff had difficulty finding his words during conversations. Tr. at 55–56. She indicated she had spoken to Plaintiff's doctor about the problems she had noticed and that his doctor indicated it could be related to his liver problems. Tr. at 56. She stated Plaintiff did not sleep well during the night and frequently napped during the day. *Id.*

b.     Vocational Expert Testimony

Vocational Expert ("VE") Martin Sydney reviewed the record and testified at the hearing. Tr. at 56–59. The VE categorized Plaintiff's PRW as a training instructor, *Dictionary of Occupational Titles* ("*DOT*") number 166.227-010, as light with a specific vocational preparation ("SVP") of seven; a candy packer, *DOT* number 920.587-018, as medium with an SVP of two; and a tech support specialist, *DOT* number 033.162-018, as light with an SVP of seven. Tr. at 57. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work with the following

30

restrictions: no climbing of ladders, ropes, or scaffolds; only occasional climbing of ramps and stairs; frequent, but not constant pushing and pulling with the lower extremities or the right upper extremity; occasional stooping, kneeling, crouching, and crawling; occasional overhead reaching with the right arm; and avoiding unprotected heights. Tr. at 57–58. The VE testified that the hypothetical individual could perform Plaintiff's PRW as a training instructor and a tech support specialist. Tr. at 58. The ALJ asked the VE to assume the hypothetical individual was further limited to simple, routine, and repetitive tasks. *Id.* He asked to VE to identify any jobs the individual could perform. *Id.* The VE indicated the individual could perform light jobs with an SVP of two as an office helper, *DOT* number 239.567-010, with 2,900 positions in South Carolina and 234,000 positions in the national economy; a cashier, *DOT* number 211.462-010, with 19,000 positions in South Carolina and 1,100,000 positions in the national economy; and an information clerk, *DOT* number 237.367-018, with 525 positions in South Carolina and 58,000 positions in the national economy. Tr. at 58–59. The ALJ asked the VE if Plaintiff had any job skills that were transferable to sedentary work. Tr. at 59. The VE responded that he did not. *Id.*

2.    The ALJ's Findings

In his decision dated August 22, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.
2.    The claimant has not engaged in substantial gainful activity since January 1, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 et *seq.*).

3.      The claimant has the following severe impairments: minimal arthritis to the hips, mild patellar chondromalacia to both knees, diabetes, hypothyroidism, obesity, venous insufficiency (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he cannot climb ladders, ropes, or scaffolds; he can occasionally climb ramps and stairs; he can frequently, but not constantly push and pull with the lower extremities; he can occasionally stoop, kneel, crouch, and crawl; he can occasionally reach overhead with the right arm; and he must avoid working at unprotected heights.

6.      The claimant is capable of performing past relevant work as a training inspector and computer technical support specialist. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2009, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. at 19–27.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      the ALJ did not adequately consider the medical opinions of record;

2)      the ALJ failed to consider Plaintiff's pain and the prescribed medications in assessing his credibility;

3)      the ALJ did not properly consider Plaintiff's impairments in combination and assessed an RFC that did not reflect the limitations his impairments imposed;

4)      the ALJ considered evidence that was not included in the record;

5)      the ALJ did not adequately consider Plaintiff's need for a cane and his use of a BiPAP machine;

6)     the ALJ failed to evaluate the effects of Plaintiff's obesity on his other impairments;

7)     the ALJ did not properly evaluate Plaintiff's mental impairments;

8)     the ALJ failed to find that Plaintiff's impairments were medically-equivalent to Listing 1.02;

9)     the ALJ failed to consider that his medical conditions were chronic and progressive in nature;

10)    the ALJ erroneously concluded Plaintiff could perform his PRW;

11)    the ALJ indicated incorrect diagnoses, relied on erroneous information in the record, and mischaracterized the evidence to support his conclusion; and

12)    the ALJ did not consider all of Plaintiff's impairments.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series

of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 415.920(h).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. §§ 404.1520(a), (b), 416.920(a)(b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*;

*Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Medical Opinions

Plaintiff argues the ALJ improperly accorded greater weight to the state agency consultants than to the opinions and observations of his treating and examining medical providers. [ECF No. 27 at 6–7]. He specifically maintains that the ALJ did not consider Dr. Yatonsky's evaluation and opinion. *Id.* at 23; ECF No. 29 at 9.

The Commissioner argues the ALJ properly weighed the medical opinion evidence. [ECF No. 28 at 19]. She maintains the ALJ accorded significant weight to the opinions and observations of Drs. Mehta, Whitson, and Von Moll. *Id.* at 20. She contends Dr. Yatsonsky only completed a questionnaire in connection with Plaintiff's claim for VA disability benefits and provided little explanation for his opinion. *Id.* at 20–21. She further argues that Dr. Yatsonsky's opinion was not supported by the evidence of record. *Id.* at 21. She maintains that substantial evidence supported the ALJ's reliance on the RFC assessments provided by the state agency physicians. *Id.*

Pursuant to 20 C.F.R. §§ 404.1527(a) and 416.927(a), medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." SSR 96-5p. "In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologist may be entitled to greater weight than the opinions of treating or examining sources." SSR 96-6p. ALJs are required to evaluate all evidence in the case record that is pertinent to the disability determination. SSR 96-5p. They must weigh medical source statements under the rules set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c) and must provide appropriate explanations for accepting or rejecting each medical opinion. *Id.*

The ALJ indicated he gave significant weight to Plaintiff's treating physicians' opinions that he would benefit from better compliance with his diabetic treatment plan

and diet. Tr. at 26. He also indicated that he accorded significant weight to the opinions of the state agency consultants because their opinions were consistent with the assessed RFC, the medical evidence as a whole, and a finding that Plaintiff was not disabled. *Id.*

The ALJ's decision makes no mention of Dr. Yatsonsky's examination, which arguably suggested that bilateral chondromalacia of patella and osteoarthritis limited Plaintiff to a greater extent than the ALJ found in his RFC assessment. *See* Tr. at 520–35. Dr. Yatsonsky's exam revealed abnormal flexion of Plaintiff's bilateral knees. Tr. at 522–23. He observed Plaintiff to have positive right knee crepitus and discomfort with varus and valgus pressure bilaterally. Tr. at 530. He suggested Plaintiff's knee impairment resulted in pain on movement, disturbance of locomotion, and interference with sitting, standing, and weight-bearing. Tr. at 525.

In *Arnold v. Secretary of Health, Ed. and Welfare*, 567 F. 2d 258, 259 (4th Cir. 1977), the Fourth Circuit indicated that courts "face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence." Dr. Yatsonsky's findings and his opinion regarding the implications of Plaintiff's knee impairments were relevant to the functional capacity assessment. While the Commissioner cites multiple reasons for rejecting Dr. Yatsonsky's opinion, the court cannot accept these reasons to fill the void in the ALJ's decision. *See Hall v. Colvin*, C/A No. 8:13-2509-BHH-JDA, 2015 WL 366930, at *11 (D.S.C. Jan. 15, 2015); *Cassidy v. Colvin*, C/A No. 1:13-821-JFA-SVH, 2014 WL 1094379, at *7 n.4 (D.S.C. March 18, 2014), citing *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing

grounds in support of the agency's decision that were not given by the ALJ."). Furthermore, the undersigned cannot accept the ALJ's decision to accord significant weight to the opinions of the state agency consultants where he neglected to reconcile their opinions with Dr. Yatsonsky's findings. In light of the ALJ's failure to consider Dr. Yatsonsky's findings and opinion, the undersigned recommends the court find that the weight he accorded to the medical opinions of record was not supported by substantial evidence.

2.     Consideration of Pain and Side Effects of Medications

Plaintiff argues the ALJ did not adequately consider his complaints of pain or the side effects of his medications. [ECF No. 27 at 8, 29–30]. He contends the ALJ should have considered his pain to be significant because he was prescribed various opiates and other strong pain medications. ECF Nos. 27 at 28, 29 at 12.

The Commissioner maintains the ALJ's credibility assessment is supported by substantial evidence. [ECF No. 28 at 14]. She contends the examinations showed normal findings and objective medical tests showed only mild impairment in Plaintiff's hips and knees. *Id.* at 15. She argues Plaintiff's daily activities were inconsistent with his complaints of disabling pain. *Id.* at 16.

"[T]he adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record" in determining whether the claimant's statements are credible. SSR 96-7p. He "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining

physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* The ALJ cannot disregard a claimant's statements about symptoms merely because they are not substantiated by objective medical evidence. *Id.* He must consider the following relevant evidence, in addition to the objective findings, in assessing a claimant's credibility:

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.; see also* 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv).

After having established the existence of a condition reasonably likely to cause the alleged symptoms, a claimant may "rely exclusively on subjective evidence to prove" the intensity, persistence, and functionally-limiting effects of his symptoms. *See Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006). The ALJ must cite specific evidence to support his credibility finding, and his reasons must be sustained by the evidence of

record. *Id*. His decision must clearly indicate the weight he accorded to the claimant's statements and the reasons for that weight. *Id.* Although this court must defer to the ALJ's findings of fact, the court is not required to "credit even those findings contradicted by undisputed evidence." *Hines*, 453 F.3d at 566, citing *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) ("An ALJ may not select and discuss only that evidence that favors his ultimate conclusion . . . .").

The ALJ found that Plaintiff's medically-determinable impairments could be expected to cause some of the symptoms he alleged, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. Tr. at 23. He found that Plaintiff's ADLs were inconsistent with his allegations because Plaintiff could bathe and dress himself; perform some household chores; prepare simple meals; mow his lawn in stages; feed, bathe, and walk his dog; attend church; watch television; and visit with family. *Id.* The ALJ indicated that neither Plaintiff's subjective complaints to his physicians nor the objective findings suggested Plaintiff was incapable of performing all work. *Id.* He then proceeded to summarize the medical evidence of record. Tr. at 23–26. The ALJ noted that Plaintiff informed his medical providers that he walked his dog twice a day and was planning to register for an IT program and was considering pursuing his bachelor's degree. Tr. at 25. He pointed out that x-rays of Plaintiff's hips revealed mild degenerative changes in December 2012. *Id.*

The ALJ concluded that the treatment notes did not document the level of dysfunction Plaintiff alleged. Tr. at 26. He found that the record showed Plaintiff to be noncompliant with diabetic treatment and dietary recommendations and that the

radiologic evidence failed to document musculoskeletal abnormalities that were consistent with Plaintiff's complaints of pain. *Id.* He acknowledged that Plaintiff had been treated for "a myriad" of impairments, but noted that all of Plaintiff's treatment had been conservative. *Id.*

The record reflects Plaintiff's numerous complaints of pain. *See* Tr. at 398–99 (joint pain in hips and knees), 530 (discomfort with varus and valgus pressure to bilateral knees), 573–74 (increased pain in hips and knees), 716 (right hip pain exacerbated by walking, standing, and sitting), 717 (right shoulder pain), 879 (knee pain), 889 (knee pain worse on right than left), 1063 (presented to ER with abdominal pain), 1154 (pain in right hip and knee), 1219 (paresthesias, numbness, and pins-and-needles sensation in bilateral feet; pain in hips, knees, and ankles worsened by weight bearing and cold weather), 1278 (right-sided abdominal pain), 1340–41 (increased pain in back and knees and pain radiating from right shoulder through fingers of right hand), 1351 (reported pain in his back and knees and occasional pain and swelling in his right upper quadrant), 1376 (presented to ER with abdominal pain). The record reflects multiple complaints from Plaintiff that his medications were ineffective or caused worrisome side effects and corresponding changes in his medications. *See* Tr. at 40 (testified that his medications caused diarrhea, constipation, drowsiness, confusion, and slowed response), 543 (complained that he was having difficulty sleeping and requested a stronger pain medication; Dr. Whitson prescribed Vicodin), 574 (indicated NSAIDs were ineffective and Dr. Whitson instructed him to take Tramadol three times daily), 852 (complained of gastrointestinal upset with Metformin IR and the medication was discontinued), 1310

42

(indicated Tramadol was not adequately controlling his pain and Dr. Ikahihifo prescribed Oxycodone), 1338 (Dr. Wahl recommended that Metformin be discontinued because of its potential negative effects on Plaintiff's liver). Plaintiff's diabetes medications were frequently adjusted because of their ineffectiveness. Tr. at 816, 857–58, 951–52, 1016, 1308, 1315.

The ALJ acknowledged some of Plaintiff's complaints and his testimony regarding the side effects of his medications. Tr. at 22 ("His medications cause him to have diarrhea, constipation, drowsiness, slow response, and sleepiness"), 24 ("the claimant reported increased hip pain"; acknowledging Plaintiff's "continued complaints of pain not allowing him to sleep at night, and reports that the tramadol was not effective" and noting that Dr. Whitson prescribed Vicodin for nighttime use, but would not increase Plaintiff's pain medication "as he could find no clinical source of significant pain"), 25 ("Dr. Turek noted that the claimant reported that he was limited by pain in his knees and hips, but that it appeared that the claimant could ambulate fine"). However, his decision reflects no meaningful consideration of the type, dosage, effectiveness, and side effects of Plaintiff's medications or of the factors that precipitated and aggravated his symptoms. Pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), ALJs must consider this evidence in assessing an individual's credibility. The record contains numerous complaints of pain and Plaintiff had conditions that were reasonably likely to cause the alleged symptoms. Therefore, Plaintiff could rely on subjective evidence, which included the feedback he gave his doctors regarding factors that aggravated his symptoms and the effects of his medications, to establish the functionally-limiting effects of his pain

and other symptoms. *See Hines*, 453 F.3d at 565. Plaintiff presented evidence to suggest his pain and medications caused additional functional limitations and the ALJ should have addressed this evidence and provided reasons for accepting or rejecting it. *See* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) ("We will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled. . . . Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.") The ALJ's failure to consider this evidence renders his credibility assessment deficient and unsupported by substantial evidence.

3.     RFC Assessment

Plaintiff argues the ALJ erroneously concluded that his severe impairments had minimal effect on his life and ability to work. [ECF No. 27 at 9]. He maintains the ALJ did not consider the combined effect of his impairments in assessing his RFC or in determining he was not disabled. *Id.* at 9–10, 24.

The Commissioner argues the ALJ considered all of Plaintiff's impairments that were reflected in the medical evidence of record in determining his RFC. [ECF No. 28 at 24]. She contends the ALJ accounted for Plaintiff's chronic shoulder pain in limiting him to only occasional overhead reaching with his right arm and in restricting him to lifting up to 20 pounds occasionally and up to 10 pounds frequently. *Id.* at 25. She maintains

Plaintiff received conservative treatment for diabetes and willfully failed to follow his doctors' orders. *Id.* at 24.

To properly assess a claimant's RFC, the ALJ must ascertain the limitations imposed by the individual's impairments and determine his work-related abilities on a function-by-function basis. SSR 96-8p. "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* The Fourth Circuit has held that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636, citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

In a case involving a claimant with multiple impairments, the ALJ must consider the combined effect of all the claimant's impairments in determining his RFC and disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The Commissioner must consider the combined effect of all of the individual's impairments "without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. §

423(b)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.* This court subsequently specified that "the adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012), *citing Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995).

The ALJ found that Plaintiff's severe impairments included minimal arthritis of the hips, mild patellar chondromalacia to both knees, diabetes, hypothyroidism, obesity, and venous insufficiency. Tr. at 19. He stated that "[t]hese impairments more than minimally affect the claimant's ability to perform work-related activity and therefore they have been assessed as severe." *Id.*

The ALJ found that Plaintiff had the RFC to perform a reduced range of light work that required he not climb ladders, ropes, or scaffolds; only occasionally climb ramps and stairs, stoop, kneel, crouch, crawl, and reach overhead with his right upper extremity; frequently, but not constantly push and pull with his lower extremities; and avoid working at unprotected heights. Tr. at 22. In assessing Plaintiff's RFC, the ALJ indicated the following with respect to his obesity:

> Treatment notes reveal that despite his obesity, the claimant was able to move about generally well and sustain consistent function. Objective examination has revealed that the claimant had good muscle tone, despite his increased body mass. The medical evidence fails to indicate that the claimant's ability to manipulate had been negatively impacted by the

46

presence of adipose tissue. After a thorough review of the evidence of record, the undersigned finds that the claimant's obesity had not had a negative effect on the claimant's ability to perform routine movements beyond the residual functional capacity stated above or upon his ability to sustain function over an 8-hour day.

Tr. at 26. He indicated he had considered Plaintiff's "subjective complaints along with the claimant's combination of obesity, poorly controlled diabetes mellitus, and his arthritis and found that the claimant is limited to no more than light work with the above stated specific limitations." Tr. at 26.

The undersigned recommends the court find that the ALJ failed to resolve conflicting evidence and did not adequately consider the combined effect of Plaintiff's impairments in assessing the RFC. Plaintiff specifically alleges that the record supported a finding that he had difficulty sitting, standing, and walking for extended periods. [ECF No. 27 at 20]. Although the record does not unequivocally support such limitations, it documents Plaintiff's complaints of problems with these functions. *See* Tr. at 44, 525, 543, 574, 716. It also contains observations from the treating and examining physicians that arguably support the notion that Plaintiff may be limited in his abilities to stand and walk. *See* Tr. at 530 (Dr. Yatsonsky indicated Plaintiff regularly used a cane as a mode of locomotion), 591 (Dr. Whitson observed Plaintiff to have decreased sensation to monofilament nylon and slightly decreased reflexes physiologically), 596 (Ms. Andrefsky observed decreased pulses in Plaintiff's bilateral feet on a diabetic foot exam), 718 (Dr. Wright observed Plaintiff to have poor balance and slow pace on tandem walk and mild limp on heel-toe-walk), 891 (Dr. Turek indicated Plaintiff had decreased sensation to light touch from his lower foot to his lower shin). While the ALJ cited some

evidence to support his conclusion that Plaintiff could "move about generally well," he did not address Plaintiff's ability to move about or maintain a seated or standing position over a lengthy period, except to the extent encompassed in the definition of light work.[6] Although the ALJ stated that he considered the combined effect of Plaintiff's impairments, the RFC assessed does not reflect such consideration. The record suggests that Plaintiff's severe impairments of arthritis of the hips, chondromalacia of the bilateral knees, diabetes (and related complications)[7], obesity, and venous insufficiency all affected his abilities to sit, stand, and walk. *See* Tr. at 530, 591, 596, 718, 891. Because the evidence of record suggested Plaintiff's ability to maintain standing, walking, and sitting positions may be impaired and that his combination of impairments may limit his abilities to a greater extent than any individual impairment, the undersigned recommends the court find the ALJ erred in failing to reconcile this evidence with the RFC he assessed.

Furthermore, because the undersigned has recommended findings that the ALJ erred in failing to consider Dr. Yatsonsky's opinion and in assessing Plaintiff's credibility, the assessed RFC does not reflect careful consideration of the record and is not supported by substantial evidence.

---

[6] Jobs classified in the "light" exertional category generally "require a good deal of walking or standing," but may require sitting most of the time with pushing and pulling of arm-hand or leg-foot controls that require greater than 10 pounds of exertion. SSR 83-10.

[7] Dr. Turek suggested that diabetic neuropathy and inflammation from high sugar may be a source of Plaintiff's discomfort.

4.      Remaining Allegations of Error

Because of the errors discussed above, the undersigned has recommended remand and declines to address the merits of Plaintiff's additional allegations of error.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

February 19, 2016                              Shiva V. Hodges
Columbia, South Carolina                       United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).